(155 App. Div. 516.)

LAMPORT v. SMEDLEY et al.

(Supreme Court, Appellate Division, First Department. March 7, 1913.)

ASSIGNMENTS (§ 64*)—ACTION TO SET ASIDE ASSIGNMENTS—EVIDENCE OF FRAUD.

Evidence, in an action to set aside certain assignments of life insurance policies and stock, *held* not to show that the assignments were induced by fraud, deception, and undue influence.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. § 125; Dec. Dig. § 64.*]

Appeal from Trial Term, New York County.

Action by Albert G. Lamport against Mary Clementine Smedley and others. Judgment for plaintiff, and defendant Smedley appeals. Reversed, and judgment dismissing the complaint directed.

See, also, 146 App. Div. 934, 937, 131 N. Y. Supp. 1124.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

John S. Wise, Jr., of New York City, for appellant.
Edmund L. Mooney, of New York City, for respondent.

SCOTT, J.   This is an action by the administrator of Hiram H. Lamport, deceased, to set aside certain assignments of life insurance policies and certain transfers of stock made by said Lamport in his lifetime to Mary Clementine Smedley, the appellant.   The ground upon which this relief is sought is that these assignments and transfers were induced by said appellant by means of fraud, deception, and undue influence practiced by her upon said Lamport, and by reason of the enfeebled condition of his mind and body, and his inability to see and act for himself.

The record is a long one, and the questions involved are essentially those of fact, for it cannot be disputed that plaintiff's decedent had a right to dispose of his property during his lifetime, if he saw fit to do so.   If the gifts made to appellant were so made of his own will, free from any fraud or undue influence, and when his mental condition was such that he was mentally competent to determine for himself what disposition he wanted to make of his property, they should not be disturbed.   In order to determine, therefore, whether the judgment appealed from, which sets aside the assignments and transfers, was justified by the facts established, it has been necessary to examine with care all the evidence.

Hiram H. Lamport at the time his relations with the appellant began, in 1901, was about 80 years of age.   He had been active in business, having been president of a large fire insurance company, of which he remained a director up to within a few years of his death.   He was possessed of a reasonable competence, invested in good securities, and also held several policies of insurance upon his life.   He was a widower, having lost his wife and two children; his nearest relatives being a sister and a half-brother, besides other collateral relatives.   With all of these his relations appear to have been friendly, but not intimate, and none of them frequently visited him.

The appellant was a maiden lady, past middle age, who had just lost her mother, to whom apparently she had for a long time devoted herself with solicitude.   At this time Hiram H. Lamport was living alone in a boarding house in Brooklyn.   He had suffered from the rupture of a small blood vessel in the brain, which had temporarily produced a disabling effect, which, however, seems to have rapidly improved.   The appellant came to the boarding house on a visit, and there met Lamport, to whom she showed kindness in reading to him and going out with him.   She left to visit friends, but at his request returned, and thereafter stayed with him and ministered to his comfort, and it is fair to say that it is clearly apparent that the relations that thereafter existed were due to the invitation of Lamport, and were not initiated by appellant.   From that time until his death appellant devoted herself exclusively to the care and comfort of Lamport.   She bore to him the relation that might have been borne by a devoted daughter to an aged and somewhat infirm father.   As expressed by some of the witnesses she was his "eyes, and hands and feet," and there is no suggestion that she ever failed to show him solicitous care and attention.   Nor is there the slightest hint of impropriety in their relations in the evidence or even in the respondent's brief.   Under appel-

lant's guidance, Lamport led a more cheerful, and doubtless a more pleasant, life than he appears to have theretofore enjoyed. He moved to pleasanter apartments, and, acting under medical advice, he and appellant made together three trips to Europe, which he seems to have thoroughly enjoyed. He died in Paris in 1907. There is nothing in the evidence to suggest that these trips to Europe and changes of residence were detrimental to Lamport, or induced by appellant for any other reason than because she believed that he would be benefited therefrom, and from beginning to end of the case we find nothing to justify plaintiff's repeated characterization of appellant as a "designing adventuress."

The assignments and transfers were made in 1905, and an important question in the case is as to Mr. Lamport's mental condition at that time. He was undoubtedly suffering, as was natural for a man of his years, from certain physical ailments, including partially impaired eyesight. As to his mental condition, there is the contradiction of evidence usual in cases like the present. The plaintiff's witnesses who testified to varying degrees of apparent mental weakness were a negro body servant, who based his judgment largely upon the circumstance that Mr. Lamport did not converse freely with him, a discharged nurse, a sister-in-law, plaintiff's wife, who, although she had been married to plaintiff for many years, had never seen Hiram H. Lamport until 1906, when she visited him for the purpose, as she expressed it, of "snooping around," having been furnished with money to make the trip by other relatives, and, finally, a lawyer who had been recommended to Lamport as a proper person to draw his will, but who was apparently unable to induce his client to accept his suggestions as to what the will should contain, and was discharged from or renounced the employment. On the other hand, the defendant produced a rather notable array of witnesses; including clergymen and men of affairs, all evidently without interest in the controversy, who testify with unbroken unanimity to Mr. Lamport's lucidity of mind, clarity of expression, and tenacity of opinion. After carefully reading and contrasting all the evidence bearing upon the question, we are unable to escape the conclusion that at the time Hiram H. Lamport made the transfers and assignments now sought to be avoided he was of sound mind, knew exactly what he was doing, and intended to do precisely what he did do. That appellant acquired an influence over Lamport was, of course, inevitable, but we find no indication that it was undue, or that she worked any fraud upon him, unless it was fraud to devote herself assiduously for six years to the promotion of his comfort and happiness as she undoubtedly did.

That the transactions were untainted by fraud is strongly indicated by the fact that the transfers were made openly by Lamport himself, without any attempt at concealment, and, so far as the stock was concerned, by the co-operation of one of the principal officers of one of the oldest and best known financial institutions in the city of New York, and that after the transfers had been made appellant left them in the same custody in which they had formerly been, and continued to use the income as it had formerly been used for the support of Mr.

Lamport and herself. It also appears that, before the transfers were made, Lamport frequently expressed his intention to make provision for appellant, and thereafter expressed satisfaction at what he had done. It is doubtless true that, after Lamport stated his intention to provide for appellant, she reminded him from time to time of his promise, and thus, in a sense, induced him to carry out his intention, but this does not indicate either fraud or undue influence. Upon the whole case, it seems apparent that appellant assumed and bore to Lamport the relation that a daughter might have borne, and that he came to regard her in that light, and that he intentionally, knowingly, and of his own volition made the transfers and assignments now sought to be avoided with a view to making a proper provision for her future. This being so, no ground is left for the interposition of a court of equity.

Our conclusion is that the twenty-second, twenty-third, twenty-fourth, and twenty-fifth findings of fact are contrary to the evidence, and without support in the evidence, and must be reversed.

With these findings eliminated there is nothing to support the judgment against the defendant-appellant Smedley, and it must be reversed, and judgment directed in favor of said appellant against the plaintiff dismissing the complaint upon the merits, and for costs in all courts. All concur.